## NORTH CAROLINA *v.* VANDERFORD.

*(Circuit Court, W. D. North Carolina.* April Term, 1888.

MALICIOUS MISCHIEF—DESTRUCTION OF ILLICIT WHISKY BY REVENUE OFFICER.
 Where a barrel of whisky is without the stamps and brands required by
 law, the mere possession of it gives no title; and a revenue officer who seizes
 such a barrel concealed on private premises, and in good faith destroys it, is
 not guilty of a misdemeanor under 1 Code N. C. § 1082, prohibiting "wanton
 and willful injuries to personal property."

. Indictment under 1 Code N. C. § 1082, for a wanton and willful in-
jury to personal property. That section, as amended by Laws 1885, c.
.53, p. 94, is as follows: "If any person shall wantonly and willfully in-
jure the personal property of another, he shall be guilty of a misde-
meanor, whether the property be destroyed or not, and shall be punished
by fine or imprisonment, or both, in the discretion of the court." The
jury returned a special verdict.

*B. F. Long,* for the State.

*H. C. Jones,* Dist. Atty., and *G. F. Brown,* Asst. Dist. Atty., for de-
fendant.

DICK, J. This indictment was found by a grand jury in a state court,
and was duly removed to this court for trial, upon the application of the
defendant, a revenue agent of the United States. The indictment is
founded upon section 1082 of the Code of North Carolina, as amended
by chapter 53 of the Acts of 1885. The charge preferred against the de-
fendant is a wanton and willful destruction of the personal property of
John L. Shoemaker, a citizen of Iredell county.

· The only question directly involved in this case is whether the defend-
ant committed the act in the manner and form set forth in the bill of in-
dictment. The object of the prosecution is not to afford redress for a
private injury, but to vindicate the law alleged to have been violated by
the commission of a wanton and willful wrong injurious to the public
welfare. Before passing upon the facts found by the jury in the special
verdict, I will consider some questions of law that were presented and
discussed by counsel in arguments before the court. The solicitor for
the state said in the course of his argument that the primary purpose of
this prosecution was to have determined by judicial judgment the ques-
tion of law whether an officer of the internal revenue service of the United
States could with impunity destroy private property before it had been
condemned as forfeited in the manner provided by law. He insisted
with much earnestness and eloquence that the well-settled principles of
the common law, and provisions of the state and federal constitutions,
had been grossly violated by the action of the defendant, as a citizen of
the state had been "deprived of his property without due process of
law." I have already stated that this question cannot be properly deter-
mined in this trial, as it is not directly involved in the issues presented
in the pleadings. It has an incidental connection with the transaction

complained of, as tending to show the spirit and purpose of the defendant. On this view of the case, I think that I can with propriety express the strong inclination of my opinion upon the matters that have been so ably and elaborately discussed. The rights of persons in civil and private life are either absolute or relative, and most of them were clearly announced and asserted in *magna charta*. In the common law the rights of persons are usually classed as consisting of the right of personal security, the right of personal liberty, and the right to acquire and enjoy property; and ample provisions have been devised to prevent wrongs that may be attempted, and to redress injuries caused by unlawful acts. Section 17, art. 1, of our state constitution distinctly announces the principles of the common law in nearly the terms employed in *magna charta* on this subject. Article 5 of the amendments to the constitution of the United States only announces and reaffirms the ancient principles of the common law, and prevents them from being unjustly invaded by the power of the federal government. The fourteenth amendment was intended to preserve the rights, privileges, and immunities of all citizens of the United States from any unequal and unjust legislation of the states. It is unnecessary to cite judicial authorities to show that the fundamental principle of the common law is well established both in England and in this country; that a citizen may, in the manner and by the methods recognized and provided by the rules and regulations of law, acquire and enjoy property; and cannot be deprived of the same without due process of law. He is also entitled to have a legal opportunity of explanation and defense of any conduct alleged to be unlawful before he is deprived of any of his private rights of person or property. Property is the dominion that a person can legally acquire and exercise over external things. He must establish some legal right or title in himself to property which has been invaded or destroyed by the negligent, unlawful, or malicious act of another, before he can sustain an action to recover damages for such alleged injury. The modes of acquiring property are either recognized or regulated by law, and there can be no vested right of property that is not legally vested. A man cannot acquire a right or title to property by any act declared by law to be criminal; and no right of action can arise out of an illegal or immoral transaction. *Holman* v. *Johnson*, Cowp. 341. The state and federal constitutions and the common law only afford protection to property, and secure its enjoyment, when legally acquired. This doctrine of the common law has been applied in numerous cases to rights claimed under contracts; and the principle is well settled that whenever the consideration of an agreement, or the act undertaken to be done, is in violation of law, good morals, or public policy, the agreement is void, and no alleged right founded upon it can be enforced in a court. *Trist* v. *Child*, 21 Wall. 441; *Oscanyan* v. *Arms Co.*, 103 U. S. 261. The government of the United States has the constitutional power to control the business and the property of the citizen, in the exercise of the essential and inherent right of taxation; and the methods of assessment, and the means and process of collecting and enforcing payment of taxes are matters clearly

within the extensive discretion of congress. In the exercise of this expressly conferred constitutional power congress has enacted the internal revenue laws, which prohibit the manufacture or the possession of spirituous liquors in any other manner than that regulated by such laws; and penalties, forfeitures, and methods of legal procedure have been provided to prevent and punish frauds, evasions, and willful violations of such legal requirements. Where spirituous liquors are manufactured, or come into the possession of any one in a manner that is contrary to or not in accordance with law, they become liable to forfeiture at the time of the commission of the unlawful act, and the title to such property at once vests in the United States, to be consummated by judgment of condemnation; and may be rightfully seized by a proper officer of the government in order that proceedings *in rem* may be instituted. Upon such seizure the question whether a forfeiture has been actually incurred belongs entirely to the federal courts, and cannot be drawn to another forum. After the seizure of property, if legal proceedings are not instituted to ascertain the forfeiture, the aggrieved party may seek relief by application to the proper United States court. He has no right of action in a state court until the proper federal court has adjudged the seizure to be wrongful, and without reasonable cause.

I will now proceed to inquire whether the conduct of the defendant in this case has deprived Shoemaker of any legal right to be heard in this court in defense of his property. Where property is seized under a provision of law, the proceedings for condemnation are *in rem*. "In such suits the claimant is an actor, and is entitled to come before the court in that character only in virtue of his proprietory interest in the thing in controversy; this alone gives him a *persona standi in judicio*. It is necessary that he should establish his right to that character as a preliminary to his admission as a party *ad litem* capable of sustaining the litigation." *U. S.* v. *Four Hundred and Twenty-Two Casks, etc.*, 1 Pet. 547. From the facts found by the jury in their special verdict it appears that the barrel of whisky seized and destroyed was illicit whisky, as it was without the stamps and brands required by law, and was found locked up in a lumber-house on the premises of Shoemaker. In this condition the law presumed that the whisky was illegally manufactured. The manufacturer, by his illegal action, acquired no right which could be transferred to another, or be enforced by any legal remedy. He could not be admitted as a claimant in a proceeding *in rem* to contest the right of the United States to a judgment of forfeiture and condemnation, unless upon affidavit he would allege that he was the *bona fide* owner of the property in controversy, and satisfy the court that he had a *prima facie* title; and then he would be required to file an answer on oath denying the facts set forth in the information before he would be entitled to a trial by jury. Where whisky has been properly manufactured, and the producer has acquired a vested right to the product of his labor, and by some subsequent irregularity or alleged wrongful act the property becomes liable to seizure, the right of the owner is not completely divested until the property is duly seized and condemned by proper legal proceedings.

He is entitled to be heard as claimant, as he has a proprietory right, and may show why the property seized should not be condemned as forfeited; and he would have a right of trial by jury to determine the issues raised by the pleadings. *Windsor* v. *McVeigh*, 93 U. S. 274.

If the views which I have expressed are correct, then Shoemaker, from the facts found in the special verdict, appears to have had no right of property or right of possession in the barrel of whisky destroyed, as he obtained or held such property in a manner that was in criminal violation of law. The fact that the barrel of whisky was concealed in his lumber-house, and was not legally stamped and branded, rendered it liable to forfeiture, and vested a title in the United States. The seizure by a properly authorized officer of the government vested the possession in the United States, and the collector would have been empowered to dispose of the same in conformity with law (Rev. St. § 3460) if the property had not been destroyed. As it was destroyed, the government was deprived of the power to institute proceedings *in rem* for condemnation and sale; the seizure became a nullity, although there was reasonable cause of seizure; and Shoemaker was placed in a condition to assert and enforce his rights at common law, if he had any. In a civil suit in a court of competent jurisdiction he can, if he is so disposed, have the question of law reconsidered, and again determined, whether a person can acquire a legal title to property manufactured or kept in possession against the express prohibition of a positive statute. The mere possession of the barrel of whisky would not be *prima facie* evidence of a right of property, as it was not stamped and branded, or in a bonded warehouse, as required by law. There are no facts in this case tending to show that Shoemaker has ever complained of the conduct of the defendant, or has desired or sought any legal redress.

I will not consider at much length the question of law elaborately discussed on the argument, whether congress, in the exercise of the power of taxation, has the constitutional right to enact a law authorizing the destruction of illicit spirits, or property used in their illegal manufacture. A statute has been enacted (1 Supp. Rev. St. U. S. 436) authorizing the destruction of property under certain circumstances, and after certain provisions have been complied with by the revenue officers making seizure, such law is a part of a complicated system of taxation, and was intended to prevent frauds and evasions of the revenue laws. This delicate and important question as to the correctness of legislative action is not involved in this case, and requires no expression of judicial opinion; but I am inclined to think that it would not be difficult to show by reason and authority that congress has not exceeded constitutional limits. Upon the subject of taxation, and the manner and methods of assessing and enforcing the prompt and effective collection and payment of taxes, the power of congress is almost unlimited by express constitutional restraint, and embraces all objects and measures that do not encroach upon the sovereign and reserved rights of the state governments. The doctrine has been frequently announced in the decisions of the supreme court that "the power of taxation involves the power to destroy." In the exercise

of this power by congress state bank-notes were taxed out of existence for the purpose of establishing a convenient, useful, and uniform national ·currency, although such banks were duly and rightfully chartered by the states. *Bank* v. *Fenno*, 8 Wall. 536; *Collector* v. *Day*, 11 Wall. 113; *Springer* v. *U. S.*, 102 U. S. 586. The hardship or injustice of revenue laws may properly be subjects for political discussion and legislative correction, but do not often present questions for judicial determination. The law that I am now considering is in no sense oppressive, as provision is made for any rightful owner of property destroyed to seek relief in due form of law, and obtain compensation from the government. This summary proceeding was devised by congress to prevent frauds upon the revenue laws—when the emergencies would not admit of delay, and when the ordinary modes of legal procedure by seizure and condemnation in the courts could not be made available. The government found it necessary to adopt this stringent measure to enforce the revenue laws by suppressing crimes committed in remote, inaccessible, and dangerous localities. The mode of redress provided furnishes an adequate remedy to rightful owners of property who may sustain damage. A person who is not a rightful owner has no just cause to complain of an invasion of vested rights. A vested interest in property is a right which it is equitable that the government should recognize and observe, and of which the individual cannot be deprived without injustice. In the exercise of the police power a state may, by legislative enactment, authorize the destruction of private property without making compensation to the owners, and without any formal proceedings in a court of law. All rights of property are, to a large extent, subject to the police power. Cooley, Const. Lim. c. 16; *Mugler* v. *Kansas*, 123 U. S. 623, 8 Sup. Ct. Rep. 273; *State* v. *Yopp*, 97 N. C. 477, 2 S. E. Rep. 458.

The legislature of this state, under the exercise of the police power, has by statute authorized the destruction of gaming tables, and the seizure of "all money or other property or thing of value exhibited for the purpose of alluring persons to bet," etc., and, without affording any opportunity to the owner to make explanation applied the same to the use of the poor and the person making the seizure. 1 Code N. C. §§ 1051, 1052. I feel sure that the manufacturers of illicit whisky are not entitled to more constitutional protection and legislative favor than gamblers or other persons whose rights of property are injured or destroyed for the security or advancement of the public welfare.

I will now proceed to consider the facts and pleadings in the case before the court. This indictment is for an alleged public wrong committed in the destruction of a barrel of illicit whisky that had been duly seized, and had no rightful owner except the United States. I readily concede the legal proposition that it is the imperative duty of a state to protect the property of a citizen from wanton and willful destruction; as such conduct is a serious injury to the peace and welfare of the whole community. But in this case no right of property of a citizen has been unlawfully invaded, and I feel sure that the peace, dignity, and general welfare of the state has not been disturbed, insulted, or injured by the

destruction of a barrel of whisky that had been manufactured in a manner contrary to the law of the land. A fair construction of the statute, upon which this indictment is founded, shows that it was only the purpose of the state legislature to protect personal property in which a citizen had acquired a legal right and title, and not to recognize and protect as property articles produced in fraudulent and criminal violation of law.

But, assuming the position that it was the right and duty of the state to institute this indictment against an officer of the federal government, for the destruction of a barrel of "blockade whisky," duly seized and in his lawful custody, I will proceed to consider whether the allegations in the indictment are sustained by the facts found by the jury in their special verdict. The indictment alleges that the destruction of the property of John L. Shoemaker was done "wantonly and willfully." These descriptive words have acquired a technical meaning by frequent judicial interpretation. In the recent case of *State* v. *Massey*, 97 N. C. 465, 2 S. E. Rep. 445, the supreme court of this state said: "The term 'wantonly' implies turpitude; that the act done is of willful, wicked purpose. The term 'willful' implies that the act is done knowingly, and of stubborn purpose, but not of malice." *State* v. *Morgan*, 98 N. C. 641, 3 S. E. Rep. 927. In *State* v. *Whitener*, 93 N C. 590, the court gave a more extended definition of the word "willful," when used in a statute creating a criminal offense; and this definition resembles one that was approved by the supreme court of the United States. "The word 'willfully,' in the ordinary sense in which it is used in statutes, means not merely 'voluntarily,' but with a bad purpose." *Felton* v. *U. S.*, 96 U. S. 699. The act alleged in the indictment must appear from the evidence to have been done both "wantonly and willfully," before the defendant can be convicted. I am of opinion, from the facts found by the jury, that there was no element of turpitude in the conduct of the defendant, and that he was not actuated by a bad spirit or wicked purpose. It does not appear that he had any improper motive or ill will against Shoemaker, and he acted with the aid and consent of the deputy-collector, who had the barrel of whisky in legal custody. The fact that Shoemaker mounted his horse, and rode away from his premises, while the revenue officers were there, may reasonably have excited apprehension in their minds that he had gone among his neighbors to make preparation to effect a rescue of the property, which the officers were not prepared to remove to a place of safe deposit. But it is unnecessary to make further conjectures as to the motives and purposes of the defendant, as the facts found by the jury fail to show that he acted "wantonly and willfully," as charged in the bill of indictment.

Let a verdict of "not guilty" be entered of record.